# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Mary Elizabeth Thoreson,                          Civil No. 11-2910 (JNE/SER)

       Plaintiff,

v.                                                **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

       Defendant.

---

Sean M. Quinn, Esq., 1200 Alworth Building, 306 West Superior Street, Duluth, MN, 55802-1800, on behalf of Plaintiff.

David W. Fuller, Esq., Office of the United States Attorney, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, on behalf of Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Mary Elizabeth Thoreson ("Thoreson") seeks review of the Commissioner of Social Security's ("Commissioner") denial of Thoreson's applications for social security disability insurance ("SSDI") and supplemental security income ("SSI"). This matter was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and the District of Minnesota Local Rule 72.1. Cross-motions for summary judgment were filed [Doc. Nos. 7 and 13], and for the reasons set forth, the Court recommends Thoreson's motion for summary judgment be denied, and the Commissioner's motion be granted.

## I.     BACKGROUND

### A.     Procedural History

Thoreson filed applications for SSDI and SSI on August 25, 2008, alleging a disability onset date of January 31, 2007. (Admin. R. at 171-83) [Doc. No. 5]. She was last insured for SSDI on September 30, 2008. (*Id.* at 509.) Thoreson claimed disability due to asplenia syndrome,[1] complex congenital heart disease [heterotaxy syndrome[2] with single atrium, single ventricle, and single AV valve], depression, scoliosis, short-term memory loss and anxiety. (*Id.* at 206, 353.) Thoreson's applications were denied initially on March 5, 2009, and reconsideration was denied on October 14, 2009. (*Id.* at 95-110.) Thoreson requested a hearing. (*Id.* at. 114-15) Administrative Law Judge Peter C. Erickson ('the ALJ') heard the matter on March 23, 2011. (*Id.* at 52-90.) On April 1, 2011, the ALJ issued an unfavorable decision. (*Id.* at 31-51.) The Appeals Council denied Thoreson's request for review of the ALJ's decision on August 26, 2011. (*Id.* at 1-6.) The denial of review rendered the ALJ's decision final. *See* 42 U.S.C. § 405(g); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). Thoreson now seeks judicial review pursuant to 42 U.S.C. § 405(g).

### B.      Thoreson's Testimony

As of the hearing on March 23, 2011, Thoreson was a 24-year-old woman. (*Id.* at 63.) Thoreson is 5'4" tall and weighs approximately 105 pounds. (*Id.* at 64-65.) In a Disability Report to the Social Security Administration ("SSA"), Thoreson explained that she has asplenia syndrome, a condition where the left side of her body internally copied the right. (*Id.* at 206.)

---

[1] Asplenia is absence of the spleen. *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") 167 (31st ed. 2007).

[2] Heterotaxy is an abnormality where the internal chest and abdominal organs are abnormally aligned across the left-right axis of the body, including a wide variety of complex cardiac lesions. One subset is called asplenia syndrome. Dr. Soo-Jin Kim, *Heterotaxy Syndrome*, Korean Circ. J. 2011 May; 41(5): 227-232, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3116098/

She does not have a spleen and has only one ventricle in her heart.  (*Id.*)  Her heart surgeries caused scoliosis; and she suffers from severe back and shoulder pain.  (*Id.*)  She cannot lift overhead.  (*Id.*)  She gets fatigued very quickly.  (*Id.*)  She is a student, and if she has a class in the morning, she has to nap in the afternoon, and rest the next day.  (*Id.*)  She also suffers depression, anxiety and short term memory loss.  (*Id.*)  She described her difficulties in two function reports submitted to the SSA.  (*Id.* at 227-34, 249-56.)

Thoreson worked part-time as a supervisor in a fast food restaurant from July 2001 through July 2004, while in high school, and again from November 2006 through January 2007, while in college.  (*Id.* at 207, 76.)  Her employer accommodated her by giving her shorter shifts, allowing her to do paperwork instead of standing, and allowing her frequent breaks.  (*Id.* at 206.)  Heat affected her and she could not be in the kitchen.  (*Id.* at 78.)  Cold also affected her, even 60 degree weather.  (*Id.*)  She quit work in 2007 after she had to leave by ambulance three times due to fatigue, tachycardia, chest pain, and shortness of breath.  (*Id.* at 77.)

Thoreson completed college in May 2008.  (*Id.* at 216.)  While in school, she was allowed to miss classes, take incompletes or independent studies; and she was given a private room and extra time to take tests.  (*Id.*)  She could sit in a chair for thirty minutes on average before experiencing stabbing pains in her back.  (*Id.* at 80-81.)  She was allowed to stand or stretch during lectures due to scoliosis.  (*Id.* at 79.)  Thoreson attributed her memory loss to being on a heart-lung machine and losing oxygen to her brain.  (*Id.* at 80.)  She recorded her lectures and listened to them over and over again.  (*Id.* at 79.)  She forgot people and their faces. (*Id.* at 80.)  When employed at the restaurant, she forgot the menu.  (*Id.*)

At the time of the hearing, Thoreson was experiencing tachycardia daily.  (*Id.* at 81.) Any bodily stress caused the tachycardia.  (*Id.*)  She also had abdominal pain whenever she ate

because she had intestinal malrotation.[3]  (*Id.* at 81-82.)  Prilosec helped her heartburn, but not her abdominal pain.  (*Id.* at 82.)  Due to problems with her pancreas, Thoreson had to eat certain foods; and she had problems getting enough calories and maintaining stable blood sugar.  (*Id.*)  This made her shaky, nervous, lightheaded, dizzy, and affected her concentration.  (*Id.* at 82-83.)  Going up a flight of stairs caused shortness of breath.  (*Id.* at 83.)

At the time of the hearing, Thoreson was a graduate student two days of classes per week.  (*Id.* at 66.)  She was in the second semester of her first year, as a full-time student.  (*Id.* at 67.)  She got A and B grades in the first semester.  (*Id.*)  She hoped to get her Master's degree in marriage and family therapy within two years.  (*Id.* at 68.)  She did not sleep well.  (*Id.* at 71.)  When home from school, she awoke at 9:00a.m., showered and rested.  (*Id.*)  She cooked simple things.  (*Id.* at 68-69.)  She sometimes did her own grocery shopping.  (*Id.*)

Thoreson said the biggest reason she could not work was due to fatigue, and the next reason was that she frequently had infections.  (*Id.* at 73.)  When fatigued, she could only read for 20-30 minutes before falling asleep.  (*Id.* at 85.)  It usually took a couple hours for her to feel better.  (*Id.*)  Because she did not have a spleen, Thoreson was getting bronchitis or a sinus infection every other week.  (*Id.* at 74, 84.)  She was not hospitalized for infections in the last few years.  (*Id.* at 74.)  She was on prophylactic antibiotics, and then stronger antibiotics when she got sick.  (*Id.*)  The ALJ asked how she was able to participate in the Master's program.  (*Id.* at 73.)  Thoreson said she was accommodated by how and when she took tests, and when she turned in assignments.  (*Id.*)  She was allowed to be late or miss classes.  (*Id.* at 73-74.)  She did not have the energy to work full-time; and had never worked full-time in her life.  (*Id.*)

---

[3] Malrotation is the failure of normal rotation of an organ during embryonic development.  *Dorland's* at 1115.

The ALJ asked if Thoreson could explain her recent low IQ score, given her good performance academically. (*Id.* at 75.) Thoreson believed it was because she felt fatigued when she took the IQ test. (*Id.*)

### C.  Medical Evidence Before the Onset Date

On April 7, 2006, Thoreson, then 19-years-old, transferred her primary care to Dr. Srinivas Chetty at Marshfield Clinic. (*Id.* at 407-10.) Dr. Chetty reviewed Thoreson's history. (*Id.* at 407.) She had Fontan repair[4] at age one. (Id.) In 2005, she suffered recurrent atrial flutter with shortness of breath. (*Id.*) She was hospitalized several times for cardioversion.[5] (*Id.*) Her atrial flutter was controlled with a pacemaker, but she began to have progressive exercise intolerance and difficulty in her daily life. (*Id.*) A revision of her Fontan procedure was performed in January 2006. (*Id.*) Her exercise tolerance improved with some limitations. (*Id.* at 408.)

Her present complaints were daily hot flashes and flushing. (*Id.*) She also developed shakiness in her hands, particularly when rushed or under stress. (*Id.*) She had a history of depression and crying spells but resisted taking anti-depressants. (*Id.*) She had trouble sleeping due to her mind racing; and she also had frequent nightmares. (*Id.*) She suffered wheezing on and off, and an inhaler did not help her asthma. (*Id.*) Thoreson said the wheezing was mild, did not interfere with her activity, and dissipated when she coughed or cleared her chest. (*Id.* at 408-09.)

---

[4] Fontan repair involves insertion of a prosthesis between the right atrium and the pulmonary artery with closure of the internal communication. *Dorland's* at 1539. Fontan circulation is where the heart and circulatory system are reconfigured so the heart functions with one ventricle instead of two. http://www.chop.edu/service/cardiac-center/heart-conditions/heterotaxy-syndrome.html [the Children's Hospital of Philadelphia, Cardiac Center].

[5] Cardioversion is the restoration of normal rhythm of the heart by electrical shock. *Dorland's* at 300.

Dr. Chetty believed all of Thoreson's symptoms could be explained by depression or anxiety, due to stress associated with her major medical problems. (*Id.* at 409-10.) He prescribed Zoloft and Xanax. (*Id.* at 410.) He did not believe that new treatment or evaluation was required for her asthma symptoms. (*Id.*)

Thoreson underwent a preoperative examination for wisdom tooth extraction on July 19, 2006. (*Id.* at 420.) At that time, Thoreson was working part-time over summer break from college. (*Id.* at 421.) She reported having sharp pains in her chest for quite some time. (*Id.* at 420.) She denied shortness of breath, cough or wheeze but had difficulty with wheezing in the past. (*Id.* at 421.) She also denied weight change, fatigue and weakness. (*Id.*) She denied abdominal pain and muscle pain or weakness. (*Id.* at 422.) She was cleared for surgery, and her wisdom teeth were extracted. (*Id.*)

On September 22, 2006, Dr. Thomas Sutton at the Children's Hospitals and Clinics of Minnesota checked Thoreson's cardiac function. (*Id.* at 361.) Her physical examination was unremarkable. (*Id.*) Since her previous visit that year, she had no significant cardiac symptoms and tolerated a mild level of fatigue. (*Id.*) Her echocardiogram showed a single ventricle anatomy with good ventricular function; mild insufficiency of her single AV valve; and good flow through her Fontan circuit to her lungs, with no evidence of clots. (*Id.*) While pacemaker dependent, she did not experience any tachycardia episodes. (*Id.* at 361, 333.) Dr. Sutton felt Thoreson was doing well from a cardiac standpoint; and she was getting through her days without significant fatigue. (*Id.* at 361.) Due to her complaints regarding her attention and oral expression, Dr. Sutton recommended a neuropsychological or neurological evaluation. (*Id.*)

Thoreson went to the Children's Hospitals and Clinics of Minnesota emergency room on January 5, 2007, for chest pain radiating to her left arm and some dizziness. (*Id.* at 349.) She

also complained of fatigue. (*Id.*) Dr. Kirsten Dummer, a cardiologist at Midwest Adult Congenital Cardiac Center, did not believe Thoreson's chest pain was cardiac in nature, due to her chronic history of similar chest pain and a stable electrocardiogram. (*Id.* at 349, 353.) Thoreson's dizziness was likely related to not taking in enough fluids. (*Id.* at 350.)

On January 10, 2007, Thoreson underwent a neuropsychological evaluation with Dr. Jason Kanz at Marshfield Clinic Brain & Spine Institute. (*Id.* at 285-90.) Thoreson had reported memory difficulties for two years. (*Id.* at 285.) She had open heart surgery in January 2006, and reported some memory loss and depression afterwards. (*Id.*) Specifically, she was forgetful, inattentive, indecisive, and had trouble word finding and with processing speed. (*Id.*) She also developed reading problems and difficulty with math. (*Id.*) Her mood was generally pleasant but fluctuated significantly with depression and anxiety about her health. (*Id.*) Her sleep and energy were poor; she had terrible nightmares; she was confused upon waking; her appetite was poor; and she had crying episodes. (*Id.*) In the past, antidepressants made her more anxious. (*Id.*)

Kanz's evaluation reported that Thoreson was in honors programs in high school and college, currently majoring in psychology. (*Id.* at 286.) Her mental status examination was normal; and test results appeared to be an adequate reflection of her current intellectual functioning. (*Id.*) On the WAIS-III IQ test, Thoreson scored 103 Full Scale IQ.[6] (*Id.*) Her memory performances on the Wechsler Memory Scale were variable, with weaknesses in list learning and delayed recall of a complex figure. (*Id.* at 287-88.) Thoreson's responses on a Personality Assessment Inventory were suggestive of severe depression, anxiety and agitation.

---

[6] Full Scale IQ scores between 90-109 are average. http://www.iupui.edu/~flip/wechsler.html [Indiana University-Purdue University Indianapolis]

(*Id.* at 288.) There was evidence suggesting her low self-esteem contributed to difficulty in concentration and making decisions. (*Id.*)

Dr. Kanz opined that Thoreson appeared to have some hippocampal or limbic structure damage, which commonly accounts for memory deficits. (*Id.* at 289.) He noted that cardioversion can produce damage to the hippocampus. (*Id.*) Although there was evidence of psychological dysfunction, Dr. Kanz did not believe it accounted for the degree of deficit observed on neurocognitive testing. (*Id.*) He noted that Thoreson continued to function adequately at school, but she might benefit from developing a framework to remember things. (*Id.*) He recommended that she use daily reminders and notes. (*Id.*)

Thoreson was evaluated for fatigue and wheezing at Children's Hospitals and Clinics of Minnesota on January 19, 2007. (*Id.* at 317.) She had to stop the treadmill exercise test after seven minutes, 44 seconds due to fatigue. (*Id.*) Her baseline lung functions showed a mild restriction. (*Id.*) The study suggested a mild restrictive thoracic defect without a reactive airway component. (*Id.*)

Thoreseon underwent an exercise test on January 22, 2007. (*Id.* at 321.) Dr. Dummer stated, "I am uncertain what to make of these ST-segment changes with exercise in a patient with single ventricle physiology." (*Id.*) She would review the test with her colleagues, and in the meantime, Thoreson should limit her exercise, especially if she had chest pain. (*Id.*)

### D.    Medical Evidence After the Onset Date

Thoreson saw Dr. Sharon Berry at Children's Hospitals and Clinics for a psychological diagnostic interview on February 15, 2007. (*Id.* at 390-92.) Thoreson worked at Taco John's part-time while a student, but recently quit due to medical procedures and fatigue. (*Id.* at 390.) She had some income from secretarial work on campus. (*Id.*) Thoreson was depressed since her

heart surgery a year ago, suffered generalized anxiety throughout her life, and had difficulty sleeping. (*Id.* at 390-91.) She experimented with medications for anxiety and depression after her last surgery but felt suicidal after one week and quit the medications. (*Id.* at 390.) She had significant self-esteem issues. (*Id.* at 391.) Dr. Berry diagnosed generalized anxiety disorder, and he would further consider diagnosing major depressive disorder. (*Id.*)

Thoreson underwent a psychological evaluation with Dr. David Einzig at Children's Hospitals and Clinics on March 20, 2007. (*Id.* at 369-71.) Thoreson described a several year history of chronic low mood with fatigue, low energy and lack of pleasure in activities. (*Id.* at 369.) Nevertheless, she was doing well in an honors program majoring in psychology and occupational therapy. (*Id.*) She had chronic sleep problems since high school, but slept better when she took Benadryl. (*Id.*) She described underlying anxiety symptoms, including constant worrying, tension, but no discrete panic symptoms. (*Id.*) She had some difficulties with memory but was able to work through it. (*Id.*) Her mental status examination was normal; and cognitive tests were not performed. (*Id.* at 370.)

Dr. Einzig diagnosed generalized anxiety disorder, dysthymia, moderate major depression, and insomnia. (*Id.* at 371.) Einzig assessed a GAF score of 55.[7] (*Id.*) He prescribed melatonin for sleep, with a back-up plan for Trazodone or Ambien. (*Id.*) He encouraged social activity, keeping busy, challenging negative thinking patterns, and relaxation strategies. (*Id.*) The next month, Thoreson reported melatonin and Trazodone had not helped her insomnia. And

---

[7] The Global Assessment of Functioning Scale "GAF" is used by clinicians to subjectively rate a patient's overall functioning. *Diagnostic and Statistical Manual of Mental Disorders* 32 (American Psychiatric Assoc. 4th ed. text revision 2000). Scores between 51 and 60 indicate moderate symptoms or moderate difficulty in social, occupational or school functioning. *Id.* at 34.

so Dr. Einzig prescribed Ambien. (*Id.* at 366-367.) Thoreson also saw a school counselor every two weeks. (*Id.*)

Thoreson had a positive tuberculosis skin test in February 2007, and was evaluated for this and chronic cough on March 22, 2007. (*Id.* at 431.) Thoreson had a cough as long as she could remember. (*Id.*) She denied chest pain, headache, and shortness of breath. (*Id.* at 432.) Her chest x-rays ruled out active tuberculosis, pneumonia and lung tumor. (*Id.*) Dr. Nymo opined the cough could be caused by asthma, postnasal drip, GERD, or her congenital heart disease. (*Id.*) She would have a pulmonary function test to evaluate her cough. (*Id.*)

Thoreson had a CT coronary angiogram on April 4, 2007. (*Id.* at 295.) The angiogram was performed to evaluate chest pain and EKG changes with exercise; and it evidenced good single ventricle systolic function with estimated ejection fraction of 55%.[8] (*Id.* at 296.) There was no evidence of coronary artery plaque or angulation.[9] (*Id.*) A limited chest CT was also performed, and evidenced heptomegaly[10] and possible small airway disease.[11] (*Id.* at 296-97.) Thoreson was treated for chest pain in the emergency room on April 20, 2007, and the pain significantly improved with Maalox and lidocaine. (*Id.* at 387.) Dr. Arms recommended taking

---

[8] Ejection fraction is a measurement of the percentage of blood leaving the heart each time it contracts. A normal left ventricle ejection fraction is 55 to 70%. http://www.mayoclinic.com/health/ejection-fraction/AN00360

[9] Angulation is the formation of a sharp obstructive angle. *Dorland's* at 92.

[10] Heptomegaly is enlargement of the liver. *Dorland's* at 857.

[11] The term small airways disease encompasses a generally poorly understood group of lung diseases that may arise primarily within the small airways or secondarily from diseases primarily affecting the bronchi or lung parenchyma. Timony Craig Allen, M.D., J.D., *Pathology of Small Airways Disease*, available at http://www.archivesofpathology.org/doi/pdf/10.1043/1543-2165-134.5.702 Parenchyma are the distinguishing specific cells of a gland or organ. *Stedman's Medical Dictionary* 1316 (27th ed. 2000).

ranitidine [Zantac] twice a day.  (*Id.*)  Dr. Nymo switched Thoreson to Prevacid in May 2007.  (*Id.* at 435.)

Thoreson saw Dr. Einzig for counseling on June 5, 2007.  (*Id.* at 364-65.)  Ambien was helping Thoreson sleep, but she still suffered from anxiety.  (*Id.* at 364.)  She was irritable, worried, self-critical, and had difficulty concentrating.  (*Id.*)  Academically, she was doing well, and described her mood as "pretty good."  Her mental status examination was normal.  (*Id.*)

On August 9, 2007, Dr. Dummer noted Thoreson was seen in the ER recently complaining of fatigue.  (*Id.* at 356.)  Her EKG was normal, and there was no evidence of arrthymia.  (*Id.*)  Thoreson was not sure if she was depressed or fatigued.  (*Id.*)  She was happy when she thought about pursuing a Ph.D.  (*Id.*)  She had trouble sleeping before she started using Ambien.  (*Id.*)  Thoreson complained of episodic confusion and difficulty word-finding, and wondered if Zestril[12] contributed to those symptoms.  (Id.)  Discontinuing the medication, however, made no difference.  (*Id.*)  Stopping Ambien only worsened her insomnia.  (*Id.*)  She slept nine hours at night with a daily afternoon nap.  (*Id.*)

Dr. Dummer stated that Thoreson's cardiac status was excellent with good systolic ventricular function, no significant atrioventricular regurgitation, and no sustained arrthymia.  (*Id.* at 358.)  She was not iron-deficient, hypothyroid or adrenal insufficient.  (*Id.*)  Dr. Dummer did not believe Thoreson's fatigue related to her congenital heart disease.  (*Id.*)  She recommended that Thoreson have more regular and intensive psychological counseling.  (*Id.*)

On December 27, 2007, Thoreson saw Dr. Mark Nymo at Marshfield Clinic complaining of two weeks of low back pain.  (*Id.* at 440.)  The pain was moderate and intermittent, and not

---

[12] Zestril [lisinopril] is an ACE inhibitor, used to treat high blood pressure and congestive heart failure.  Side effects include feeling like you might pass out, flu symptoms, tired feeling, muscle weakness, pounding or uneven heartbeats, and chest pain.  http://www.drugs.com/zestril.html

present that day.  (*Id.*)  Raking or shoveling accentuated the pain.  (*Id.*)  Her physical examination was normal.  (*Id.* at 440-41.)  Dr. Nymo recommended stretching, acetaminophen, and to avoid heavy lifting.  (*Id.* at 441.)  An x-ray of Thoreson's lumbar spine showed minimal curve at the thoracolumbar junction and mild degenerative changes at L3, and possibly T12-L1 and L1-2.  (*Id.* at 442.)

On January 31, 2008, Thoreson underwent a routine cardiac evaluation with Dr. Dummer.  (*Id.* at 353-54.)  Thoreson was feeling better after recovering from EBV[13] infection.  (*Id.* at 353.)  She was applying to graduate schools for psychology and trying to start a non-profit organization for patients with heterotaxy syndrome.  (*Id.*)  Thoreson denied palpitations, syncope, lightheadedness, orthopnea and dyspnea.  (*Id.*)  She did push-ups and sit-ups a couple times per week.  (*Id.*)  She looked forward to using the gym at her new school.  (*Id.*)  She felt occasional chest heaviness when lifting.  (*Id.*)  Dr. Dummer found Thoreson to have an excellent clinical status with good ventricular function, minimal AV valve regurgitation, and no sustained arrthymia.  (*Id.* at 355.)

On August 28, 2008, Thoreson had another routine evaluation at the Children's Heart Clinic.  (*Id.* at 351.)  Thoreson reported difficulty sleeping, even after trying relaxation, psychiatry, biofeedback and Tylenol p.m.  (*Id.*)  At times her heart rate increased for no reason.  (*Id.*)  She also wondered if she had reactive hypoglycemia.  (*Id.*)  On examination, Thoreson appeared well and was not short of breath at rest.  (*Id.* at 352.)  Dr. Dummer again opined that Thoreson had excellent clinical status with good ventricular function, minimal AV valve regurgitation, and no sustained arrthymia.  (*Id.*)  She recommended evaluation by an adult

---

[13] EBV stands for Epstein-Barr virus, a virus that causes mononucleosis.  *Dorland's* at 2089.

pulmonologist to rule out ciliary dysfunction.[14]  (*Id.*)  Dr. Dummer also recommended that Thoreson "self-restrict for any exertional symptoms."  (*Id.*)  She did not make any changes to Thoreson's medications but gave Thoreson an event monitor to assess her heart rate.  (*Id.*)  The event monitor recorded from August 28, 2008 through September 26, 2008, and indicated sinus tachycardia on one occasion.  (*Id.* at 299.)

Thoreson had a chest x-ray on November 5, 2008 to evaluate wheezing, but there was no acute abnormality.  (*Id.* at 727.)  The next week, Thoreson was evaluated for cough and chest pain by Dr. Steven Kurachek at Children's Respiratory and Critical Care Specialists.  (*Id.* at 821-25.)  Dr. Kurachek found no history to suggest cilia disease or swallowing disorder.  (*Id.* at 825.) Testing revealed Thoreson had a mild to moderate obstructive defect without any evidence of restriction.  (*Id.* at 824.)  Dr. Kuracek diagnosed probable acute sinusitis.  (Tr. 825.)  Cilia disease was thought to be unlikely because Thoreson did not have a history of chronic otitis and bronchitis.  (*Id.*)  Although chronic sinusitis could contribute to her symptoms, Dr. Kurachek did not believe it would account for her level of dysfunction.  (*Id.*)  Thoreson's repeat chest x-rays of January 27, 2009 showed no acute process.  (*Id.* at 1094.)

On February 12, 2009, Dr. Dummer wrote a letter on Thoreson's behalf.  (*Id.* at 545.) She noted Thoreson had a congenital heart disease with chest pain during an exercise treadmill test in August 2008.  (*Id.*)  Dr. Dummer opined that Thoreson had "some exercise limitations due to her cardiac circulation."  (*Id.*)  Although she did not recommend specific activity restrictions, Dr. Dummer opined Thoreson should rest if she felt any excessive fatigue or palpitations during exercise.  (*Id.*)

---

[14]  In humans, a critical role of cilia is defense of the airway.  Ciliary dysfunction results in impaired respiratory defense.  DA Gudis, NA Cohen, *Cilia Dysfunction*, Otolaryngol Clin North Am. 2010 June; 43(3): 461-72, available at http://www.ncbi.nlm.nih.gov/pubmed/20525503

Thoreson saw Dr. Sutton on March 6, 2009, for a cardiac check.[15] (*Id.* at 543-44.) Thoreson reported atypical chest pain and "somewhat difficult" breathing. (*Id.* at 543.) Thoreson was concerned about her exercise tolerance, but Dr. Sutton did not believe it was out of range, given her single ventricle. (*Id.*) She also reported some occasional fullness of her abdomen, which responded well to Lasix. (*Id.*) Dr. Sutton opined Thoreson was doing very well from a cardiac standpoint. (*Id.* at 544.) Her ventricular function was excellent, and her heart rhythm was under good control. (*Id.*) Thoreson was planning on moving out of state; Dr. Sutton opined that insurability and employability were going to be a significant issues for her. (*Id.*) He further stated, "[i]t is certainly gratifying to see her have reached this age and be doing so well despite her significant underlying cardiac problems." (*Id.*)

Dr. Mary Mullen at the Cardiology Clinic of Boston Adult Congenital Heart Service assumed care over Thoreson on July 15, 2009, after Thoreson moved to New Hampshire. (*Id.* at 551.) Thoreson reported being well overall since moving. (*Id.*) She tired after climbing several flights of stairs. (*Id.*) She had mildly atypical chest discomfort and rare palpitations. (*Id.*) She had difficulty sleeping due to anxiety. (*Id.*) She had a history of wheezing, with recent sinus congestion and low grade fevers, treated with daily amoxicillin. (*Id.*) Thoreson graduated,[16] and planned to take graduate coursework to become a Child Life Specialist. (*Id.*) Dr. Mullen opined Thoreson was clinically stable, but was concerned about Thoreson's upper respiratory

---

[15] At this visit, Atenolol first appears in Thoreson's list of medications. (*Id.* at 543.) Atenolol is a beta blocker used to reduce heart rate. Side effects are usually mild and transient but it can aggravate breathing difficulties in patients with asthma, chronic bronchitis or emphysema. http://www.medicinenet.com/atenolol/article.htm

[16] In a Disability Report, Thoreson reported she graduated college in May 2008. (Admin. R. at 216.)

symptoms, and ordered pulmonary function tests and tests for vocal cord dysfunction.  (*Id.* at 552.)

Thoreson underwent a psychological evaluation at the request of the SSA on September 15, 2009, with Dr. Thomas Burns.  (*Id.* at 555-59.)  Thoreson told Dr. Burns her main symptom from asplenia syndrome was fatigue.  (*Id.* at 555.)  Mild exercise exhausted her; and she had to take breaks during the day to function.  (*Id.*)  She was depressed at times due to her heart condition.  (*Id.*)  She occasionally had short-term memory problems.  (*Id.*)  She had to give up school because she could not remember lectures.  (*Id.*)  She found it difficult to focus at times. (*Id.*)  Other times, she did not recognize the faces of her own family.  (*Id.*)  Her mental status examination was normal; there were no obvious acute problems with memory or concentration, and intelligence appeared average.  (*Id.* at 556.)  Thoreson scored a Full Scale IQ of 76 on the WAIS-IV.[17]  (*Id.* at 557.)

Thoresen told Dr. Burns she usually awoke at 5:00 or 6:00 a.m. but tried to go back to sleep until 10:00 a.m.  (*Id.*)  She showered, dressed and ate.  (*Id.*)  On a good day, she would run errands before resting.  (*Id.*)  She had dinner and watched television or searched the Internet. (*Id.*)  She talked to her mother on the phone.  (*Id.*)  Later, she played a game or watched a movie with her boyfriend.  (*Id.*)  She went to bed at 11:00 p.m., but it usually took her hours to fall asleep.  (*Id.*)  Occasionally, she went bowling or swimming.  (*Id.*)  She read books about philosophy.  (*Id.*)  Thus, Dr. Burns opined Thoresen could perform all self-care, typical household tasks, handle money, deal with various professionals, and cope with the typical challenges of daily life.  (*Id.* at 558.)  She had good social skills, but her social activities were limited by her frequent fatigue.  (*Id.*)  During testing, she appeared to have working memory

---

[17] A Full Scale IQ score of 76 indicates borderline intellectual functioning. http://www.iupui.edu/~flip/wechsler.html

difficulty.  (*Id.*)  Her concentration was good, but she appeared to fatigue toward the end of testing, and this seemed to affect the testing.  (*Id.* at 559.)

Dr. Burns stated:

> Ms. Thoreson does not appear to have many physical reserves to draw on to handle stressful situations. . . . She appears able to get along with coworkers and supervisors from a purely psychological and emotional point of view.  She did report that her frequent fatigue in her few vocational situations in the past did lead to workplace complications.  She told me that her increasing fatigue is the main reason for no vocational activity at this time.
> . . .
> It appears to me that virtually all of Ms. Thoreson's cognitive inefficiencies and emotional discomfort are traced back to her congenital disorder.  She appears to have a kind of cognitive slowness, inefficiency, and fatigue which seems almost surely due to her physical fatigue.  One gets the strong sense that with some more energy, the scores on both the cognitive and intellectual measures would improve considerably. . . .

(*Id.*)

Dr. Martha Fishman at the Children's Hospital of Boston Pulmonary Clinic evaluated Thoreson for shortness of breath with exercise and chronic cough on September 18, 2009.  (*Id.* at 816.)  She also complained of GERD, with occasional right-sided abdominal pain.  (*Id.*) Thoreson had abnormal bronchial anatomy, with both upper lobe bronchi arising directly from the trachea.  (*Id.*)  On examination, Thoreson had an intermittent inspiratory wheeze, more prominent when supine.  (*Id.*)  In pulmonary function tests, Thoreson had normal oxygen saturation.  (*Id.*)  There was no evidence of obstruction or restrictive defect or air trapping in her lungs, but her maximal respiratory pressures were mildly reduced.  (*Id.*)

Dr. Fishman opined that Thoreson had a possible component of sinusitis and bronchitis, evidenced by her positive response to antibiotic therapy in November 2008; and she continued to have noisy breathing and frequent cough at night.  (*Id.* at 816.)  Dr. Fishman ordered a sleep

study, prescribed Atrovent,[18] and recommended evaluation of Thoreson's tonsils.  (*Id.*)  She also increased Thoreson's omeprazole dosage for gastric irritation and abdominal pain.  (*Id.* at 817.)

Thoreson saw Dr. Mullen for evaluation of chronic cough and "noisy breathing" on February 19, 2010.  (*Id.* at 784-85.)  Thoreson tested at the low end of normal lung volumes and flows, with no evidence of airway obstruction.  (*Id.* at 785.)  Dr. Mullen noted Thoreson had some abnormalities on her sleep study, suggesting upper airway problems.  (*Id.*)  Dr. Mullen recommended tonsil and adenoid evaluation.  (*Id.*)  Thoreson had her tonsils removed on June 2, 2010.  (*Id.* at 1200.)  At the time of surgery, Thoreson had excellent hemodynamics, and her cardiac status was stable.  (*Id.* at 1201.)

In January 2011, Thoreson saw Drs. Thomas Sutton, Charles Gornick and Chris Carter at Midwest Adult Congenital Cardiac Clinic for a cardiac check.  (*Id.* at 1198.)  Dr. Sutton noted that since Thoreson's last visit in May 2010, her history was fairly unremarkable.  (*Id.*)  Thoreson was now in graduate school in Wisconsin, and complained of considerable fatigue that was worse in the morning and improved throughout the day.  (*Id.*)  Her physical examination was generally unremarkable and chest x-rays were normal.  (*Id.* at 1198-99.)  Her echocardiogram showed excellent function, and EKG showed sinus rhythm.  (*Id.*)  A 30-day event recorder from October 9, 2010 through November 7, 2010 showed some occasional premature atrial contractions ("PACS")[19] with interventricular conduction delay,[20] but no serious abnormalities.

---

[18]  Atrovent is used to prevent narrowing airways in the lungs in people with bronchitis, emphysema or COPD.  http://www.drugs.com/atrovent.html

[19]  Premature atrial contractions are extra heartbeats arising from the atria and are a very common occurrence, usually not serious.  http://www.webmd.com/heart-disease/heart-rythym-disorders

[20]  Interventricular conduction is an impulse from ventricles to atria.  *Dorland's* at 408.

(*Id.*)  Dr. Sutton opined Thoreson was doing well from a cardiac standpoint, and he ordered blood work to evaluate her complaints of fatigue.  (*Id.*)

On February 10, 2011, Thoreson's oxygen consumption was 64% of predicted, and she quit the exercise test due to fatigue.  (*Id.* at 1223.)  Thoreson had reduced minute ventilation at 39% of predicted.[21]  (*Id.*)  The results were compatible with ventilator and oxygen consumption deficit associated with exercise.  (*Id.*)  Formal pulmonary function tests were considered appropriate follow up but are not in the record.  (*Id.*)

### E.    Medical Evidence Submitted to the Appeals Council After the Hearing

Nurse Practitioner Andrea D'Angelo from Marshfield Clinic wrote a letter on Thoreson's behalf on March 28, 2011.  (*Id.* at 1226-28.)  D'Angelo was Thoreson's primary care provider for the last year and had otherwise treated her for several years.  (*Id.* at 1226.)  D'Angelo stated, "[Thoreson] continues to function with a single ventricle and a single atrium which leaves her markedly more fatigued than an individual her age with a healthy heart."  (*Id.*)  In October 2010, a cardiac monitor indicated Thoreson was having premature atrial contractions, which D'Angelo noted could cause Thoreson's symptoms of fatigue, exhaustion, chest pain and palpitations.  (*Id.*)  She was treated with beta blockers, but the medication could also make her markedly more fatigued.  (*Id.*)  Activity and stress induce premature atrial contractions, and cause shortness of breath and fatigue.  (*Id.*)

---

[21] Minute ventilation is the total volume of gas in liters exhaled from the lungs per minute. http://medical-dictionary.thefreedictionary.com/minute+ventilation

Thoreson also had chronic wheezing and coughing for five years, which inhalers did not relieve. (*Id.*) Possible causes included asthma, primary ciliary dyskinesia[22] or plastic bronchitis.[23] D'Angelo opined that plastic bronchitis was the most likely, but difficult to diagnose. (*Id.*) It would explain Thoreson's severe fatigue and chronic infections, which she had been experiencing every 2-4 weeks for the last two years. (*Id.* at 1227.) She was getting tonsil, sinus and lung infections concurrently at least once a month, leaving her ill for seven to ten days at a time. (*Id.*) Removing her tonsils helped for two months, but then she had sinusitis or bronchitis once or twice a month. (*Id.*) She was on prophylactic antibiotics. (*Id.*) The infections were a major contributor to her fatigue. (*Id.*)

Thoreson had an annular pancreas,[24] causing frequent hypoglycemia. (*Id.*) Symptoms included light-headedness, fainting, irritability, and decreased ability to concentrate. (*Id.*) She was also born with duodenal atresia[25] and intestinal malrotation, which caused moderate to severe pain after eating, depending on the type of food eaten. (*Id.*)

D'Angelo opined Thoreson pushed herself in graduate school. (*Id.*) After her January 2006 heart surgery, she experienced decreased ability to concentrate and short term memory loss due to decreased oxygen saturations in her body while she was on a heart-lung machine several

---

[22] Primary ciliary dyskinesia is a disorder characterized by chronic respiratory tract infections, abnormally positioned internal organs and infertility. The signs and symptoms are caused by abnormal cilia and flagella. http://ghr.nlm.nih.gov/condition/primary-ciliary-dyskinesia

[23] Plastic bronchitis is characterized by marked obstruction of the large airways by bronchial casts. Diagnosis is usually made when the casts are expectorated. Ebru Yalcin, M.D., Ugur Ozcelik, M.D., Alpay Celiker, M.D., *Plastic Bronchitis Occurring Late after the Fontan Procedure in a Child: Treatment with Stent Implantation in the Left Pulmonar*, The Journal of Invasive Cardiology, June 2005, available at http://www.invasivecardiology.com/article/4232

[24] Annular pancreas is a developmental anomaly in which the pancreas forms a ring around the duodenum. *Dorland's* at 1387.

[25] Atresia is the absence or closure of a normal body orifice or tubular organ. *Id.* at 175.

times in 2005. (*Id.*) Because her cognitive symptoms did not remit after one year, they were considered permanent brain damage. (*Id.*) Her heart surgery induced scoliosis also induced pain from being seated too long. (*Id.*) D'Angelo concluded "[a]ll of these medical issues result in [Thoreson's] inability to hold a job that would provide a significant source of income." (*Id.* at 1228.)

Approximately two weeks later, Dr. Mark Nymo responded to written questions posed by Thoreson's counsel. (*Id.* at 8-10.) Counsel asked Dr. Nymo his opinion about a listed impairment relating to Thoreson's arrthymia. (*Id.* at 8.) Dr. Nymo explained that Thoreson's arrthymia appeared to be well-controlled. (*Id.*) She had occasional premature atrial contractions between October 9, 2010 and November 7, 2010. (*Id.*) Although Dr. Nymo was not a cardiologist, Thoreson's echocardiogram did not show any congestive heart failure. (*Id.*) Thoreson did not have ventricular dysfunction and was not currently having arrthymias. (*Id.*) Dr. Nymo did not know whether a maximum VO2 on exercise stress test at 64% of predicted[26] was evidence to fit the listing criteria, but noted it was very good for someone with Thoreson's anatomy, according to her cardiologist. (*Id.*)

Dr. Nymo stated he did not typically perform disability ratings typically, but from Thoreson's actual job history, it sounded like she had difficulty with maintaining consistency in a full-time job. (*Id.* at 10.) Dr. Nymo did not feel capable of answering whether Thoreson could perform a sedentary light-duty type job on a full-time basis, but her history suggested she would

---

[26] VO2 max is an estimation of the body's ability to use oxygen for energy. A VO2 max of 56% with a 70% maximum heart rate is considered moderate fitness. *Explanation of Cardio Test Results*, available at http://www.exrx.net/Testing/CardioTestsResults.html [Exercise Prescription on the Internet]

be challenged to do so.  (*Id.*)  Dr. Nymo thought a work hardening evaluation might provide a more objective answer.  (*Id.*)

Thoreson saw Nurse D'Angelo at Marshfield Clinic on April 21, 2011, for difficulty breathing.  (*Id.* at 11-13.)  D'Angelo noted Thoreson was seen a couple months earlier for sinusitis and bronchitis and was treated with Cipro.  (*Id.* at 11.)  Thoreson's symptoms improved, but she continued to have intermittent wheezing and coughing.  (*Id.*)  Thoreson questioned whether she could try chronic antibiotic use, as her pediatric pulmonologist prescribed in the past.  (*Id.*)  Bronchodilators had not helped and made her somewhat tachycardiac.  (*Id.* at 12.)  D'Angelo diagnosed chronic bronchitis and prescribed ciprofloxacin.  (*Id.* at 13.)

Next, Thoreson had a chest CT scan on June 7, 2011, and there was no evidence of bronchiectasis.[27]  (*Id.* at 16.)  Thoreson also had a maxillofacial CT that day, showing no evidence of acute inflammatory process.  (*Id.*)

F.     State Agency Medical Consultants' Opinions

At the request of the SSA, Dr. Robert Collear reviewed Thoreson's social security disability file on March 3, 2009, and completed a Physical Residual Functional Capacity Assessment.  (*Id.* at 509-16.)  He opined Thoreson could perform light work, avoiding all exposure to hazards, and never climb ramps, stairs, ladders, ropes or scaffolds.  (*Id.* at 510-13.)  Dr. George Walcott reviewed Thoreson's social security disability file at the request of the SSA on October 5, 2009, and also completed a Physical Residual Functional Capacity Assessment.  (*Id.* at 561-68.)  He opined Thoreson could perform light work, avoiding all exposure to hazards, including strong magnetic fields.  (*Id.*)

---

[27] Bronchiectasis is chronic dilation of the bronchi marked by fetid breath and paroxysmal coughing with expectoration of mucopurulent matter.  *Dorland's* at 255.

Dr. Eric Edelman reviewed Thoreson's social security disability file at the request of the SSA in March 2009, and completed a Psychiatric Review Technique Form, noting Thoreson had an organic mental disorder, an affective disorder, and an anxiety-related disorder. (*Id.* at 517-30.) He opined these impairments caused no difficulties in social functioning, mild restriction in activities of daily living, and moderate difficulties in maintaining concentration, persistence or pace. (*Id.* at 527.) In a Mental Residual Functional Capacity Assessment Form, Dr. Edelman opined Thoreson would be limited to unskilled work due to moderate difficulties in concentration, complex memory tasks, and difficulties dealing with stress and adapting to change. (*Id.* at 533.) Then, at the request of the SSA, Dr. Deborah Pape reviewed Thoreson's social security disability file on October 13, 2009. (*Id.* at 572-85.) She opined Thoreson had the ability to meet the basic mental demands of unskilled work. (*Id.* at 589.)

### G.    Evidence from the Vocational Expert

Ed Utities[28] testified as a vocational expert; and Thoreson's counsel had no objection to his qualifications. (*Id.* at 85-86.) The ALJ asked Utities to consider a woman in her early 20s with a college degree and currently in a master's program, with no past relevant work. (*Id.* at 86). The individual had complex congenital heart disease with asplenia and heterotaxy syndrome, and had a pacemaker. (*Id.*) She also had scoliosis and symptoms of fatigue and memory loss. (*Id.*) The ALJ told Utities to assume the individual had a sedentary residual functional capacity, could lift ten pounds occasionally and five pounds frequently; be on her feet two hours in an 8-hour day, but for a maximum of thirty minutes at a time; sit for eight hours per

---

[28] The correct spelling of the vocational expert's name is found on the Pre-Hearing Vocational Report. (Admin. R. at 279.)

day, but only one hour at a time; climb stairs frequently;[29] avoid all heights and dangerous moving machinery; no temperature or humidity extremes; and low to moderate stress, meaning no high production quota or work on an assembly line that required keeping up with others. (*Id.* at 86-87.) Utities testified such a person could perform unskilled clerical jobs such as order clerk, charge account clerk, call-out operator, and others of which there were approximately 4,000 such jobs in Minnesota.[30] (*Id.* at 87.)

Utities testified there were other benchwork assembly jobs that would typically allow for a sit/stand option and fit the hypothetical question. (*Id.* at 87-88.) His examples were final assembler, fishing reel assembler, compact assembler, and similar other assembly jobs of which there were more than 5,000 jobs in Minnesota.[31] (*Id.* at 88.) Based on Utities' knowledge of the DOT and his professional experience, these jobs would fit the ALJ's nonexertional limitations in the hypothetical question. (*Id.*) The ALJ asked Utities if there would be competitive employment for a person who would be absent from work one day a week. (*Id.*) Utities said there would not. (*Id.*) Thoreson's counsel then asked Utities whether there would be competitive employment if the individual had to take fifteen to twenty minute breaks every hour or so. (*Id.* at 88-89.) Utities testified that employers would not tolerate such breaks. (*Id.* at 89.)

### G. The ALJ's Decision

On April 1, 2011, the ALJ issued an unfavorable decision. (*Id.* at 31-51.) In finding that Thoreson was not disabled, the ALJ employed the required five-step evaluation considering: (1) whether Thoreson was engaged in substantial gainful activity; (2) whether Thoreson had severe

---

[29] The ALJ's RFC finding is for infrequent stair climbing. (*Id.* at 39.) The hearing transcript may contain a phonetic error on the transcriber's part.

[30] DOT [Dictionary of Occupational Titles] Codes 209.567-014; 205.367-014; 237.367-014.

[31] DOT Codes 713.687-018; 732.684-062; 739.687-066.

impairments; (3) whether Thoreson had an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether based on the claimant's residual functional capacity, could she perform her past relevant work; and, if not, (5) whether there is other work that exists in significant numbers in the national economy that the claimant could perform. *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

At the first step of the evaluation, the ALJ found Thoreson had not engaged in substantial gainful activity since January 31, 2007, the alleged onset date. (*Id.* at 36) (citing 20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*). At the second step, the ALJ found that Thoreson had severe impairments with her history of complex congenital heart disease with asplenia and heterotaxy symptoms; status-post pacemaker placement; symptoms of fatigue and short-term memory loss; and scoliosis. (*Id.*) (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

At step three, the ALJ concluded Thoreson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*Id.*) (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). In explanation, the ALJ stated Thoreson's scoliosis was mild, and she could ambulate effectively. (*Id.* at 37.) Her mental impairments caused only mild restrictions in activities of daily living when not fatigued, because she could attend to her personal needs without reminders, do housework, shop, prepare simple meals, occasionally bowl; and hoped to volunteer at a hospital. (*Id.* at 38.) She had no difficulties in social functioning because she lived with a roommate, got along with her family, watched movies with friends, interacted with others online, got along with authority figures, had good social skills, and was engaged to be married. (*Id.*) Thoreson had only moderate difficulties in concentration, persistence or pace

because she was in a master's program earning As and Bs, graduated *summa cum laude* from college, drove a car, managed her personal finances, had hobbies, but needed reminders to go places, frequently forgot what she read, had difficulty following spoken instructions, did not handle stress or adapt to changes well, and cried about small things. (*Id.*) She did not have any episodes of decompensation. (*Id.*) There was also no evidence under the "C criteria" of the listings. (*Id.*)

At step four of the evaluation, the ALJ determined Thoreson had the residual functional capacity to:

> Perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with lifting five pounds frequently and ten pounds occasionally; standing and/or walking for roughly two hours and sitting for approximately eight hours out of an eight-hour workday; with time on feet restricted to 30 minutes at a time and sitting for a maximum of one hour at a time; only infrequent climbing up stairs; no exposure to heights or dangerous moving machinery; no exposure to extremes in temperature or humidity; and restricted to low-to-moderate stress tasks (i.e. no high production quotas and no assembly line work).

(*Id.* at 39.) The ALJ described Thoreson's cardiac impairments and evaluations, concluding that she could perform sedentary work with the identified nonexertional limitations. (*Id.* at 40.) The ALJ specifically noted Dr. Dummer's comment that she did not believe Thoreson's fatigue was related to her congenital heart disease. (*Id.*) The ALJ stated "there are no objective cardiac findings that could conceivably contribute to" her alleged fatigue. (*Id.*)

The ALJ recognized that Thoreson's absence of a spleen necessitated chronic prophylactic antibiotic therapy to prevent infection but found her associated symptoms were minimal, and treatment was routine and conservative. (*Id.* at 41.) Her scoliosis contributed to her physical restrictions, with intermittent pain and was exacerbated only by raking or shoveling.

(*Id.*)  At times, she had no back pain at all.  (*Id.*)  Other objective lumbar spine findings were normal.  (*Id.*)

The ALJ concluded Thoreson's short-term memory deficits after heart surgery in January 2006 would "impose the mental restrictions in the residual functional capacity."  (*Id.*)  Her mental status examinations showed an ability to perform low-to-moderate stress work.  (*Id.* at 42.)  Furthermore, her September 2009 IQ tests were "almost certainly invalid," because she graduated college *summa cum laude* in 2009, and was getting As and Bs in a master's level program.  (*Id.*)[32]  Thoreson also believed her IQ was higher than 76.  (*Id.*)  Thoreson's sporadic work history raised the question whether her continuing unemployment was due to her medical impairments.  (*Id.*)

Thoreson's daily activities were fairly limited but two factors weighed against considering this as strong evidence of her disability.  (*Id.*)  First, her daily activities could not be objectively verified.  (*Id.*)  Second, it was difficult to attribute her limited daily activities to her medical condition instead of other reasons, due to the relatively weak medical evidence.  (*Id.*)  Her activities were consistent with and likely in excess of the ALJ's residual functional capacity.  (*Id.*)  The ALJ considered the opinions of Drs. Callear and Walcott and gave their opinions significant weight, but found Thoreson had even greater restrictions.  (*Id.* at 42-43.)  Dr. Dummer did not give Thoreson specific restrictions but noted she should rest if she felt excessive fatigue or palpitations during exercise.  (*Id.* at 43.)  The ALJ accommodated this by giving Thoreson a sedentary residual functional capacity.  (*Id.*)

_____

[32] The ALJ cited an email from an individual who was involved with providing Thoreson a training grant for her education.  (*Id.* at 570.)  The individual noted Thoreson graduated from St. Catherine's *summa cum laude* with a B.A. in Psychology, and Thoreson planned to do volunteer work at Boston's Children's Hospital for a year before going to graduate school.  (*Id.*)

The ALJ gave significant weight to Drs. Edelson's and Pape's mental residual functional capacity opinions. (*Id.*) The ALJ gave consultative examiner Dr. Burn's opinion some weight, although it appeared to be based purely on subjective complaints. (*Id.*) Dr. Burns was not a medical doctor qualified to assess Thoreson's physical abilities. (*Id.*) The ALJ noted the record did not contain opinions from any treating physicians, psychiatrists or psychologists indicating disability or greater work restrictions. (*Id.* at 44.)

Thoreson did not have any past relevant work. (*Id.*) (citing 20 C.F.R. §§ 404.1565 and 416.965). Based on the vocational expert's testimony, the ALJ found Thoreson would be able to perform other jobs that exist in significant numbers in the national economy such as order clerk, charge account clerk, final assembler, fishing reel assembler or compact assembler. (*Id.* at 44-45) (citing 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)). Therefore, Thoreson was not under a disability, as defined in the Social Security Act, from January 31, 2007 through the date of the decision. (*Id.* at 45) (citing 20 C.F.R. §§ 404.1520(g) and 416.920(g)).

## II. STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

### A. Administrative Review

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision. 20 C.F.R. §§ 404.909(a)(1); 416.1407. A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review. 20 C.F.R. §§ 404.929; 416.1429. If the claimant is dissatisfied with the ALJ's decision, then an Appeals Council review may be sought, although that review is not automatic. 20 C.F.R. §§ 404.967–982; 416.1467-81. If the request for review is denied, then the Appeals Council or ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court. 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981; 416.1481. An appeal to a federal court of either the Appeals Council or the ALJ's decision must occur within sixty days after notice of the Appeals Council's action. *Id.*

### B. Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). This Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'" *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (citation and internal quotation marks omitted)). A court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence." *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). Yet, this Court must "consider evidence that detracts from the Commissioner's decision as well as

evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted).

In reviewing the ALJ's decision, this Court analyzes the following factors: (1) the ALJ's findings regarding credibility; (2) the claimant's education, background, work history, and age; (3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the claimant's subjective complaints of pain and description of physical activity and impairment; (5) third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments. *Brand v. Sec'y of the Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980). Proof of disability is the claimant's burden. 20 C.F.R. §§ 404.1512(a); 416.912(a). Thus, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355. If substantial evidence on record as a whole permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed. *Pearsall v. Massanari*, 274 F.3d

1211, 1217 (8th Cir. 2001).  This Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently."  *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

There is a special standard of review addressing situations where the Appeals Council considered new evidence but declined review:

> When the Appeals Council has considered material new evidence and nonetheless declined review, the ALJ's decision becomes the final action of the Secretary.  We then have no jurisdiction to review the Appeals Councils action because it is a nonfinal agency action.  *See Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  At this point, our task is only to decide whether the ALJ's decision is supported by substantial evidence in the record as a whole, including the new evidence deemed material by the Appeals Council that was not before the ALJ.  As we have noted, "this [is] a peculiar task for a reviewing court."  *Rilely v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994).  Some circuits simply refuse to consider such tardy evidence as a basis for finding reversible error. *See Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994); *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993).  But we do include such evidence in the substantial evidence equation.

*Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir. 1995).

## III. DISCUSSION

Thoreson alleges the ALJ and Appeals Council committed three errors:  1) the ALJ erred by discounting Thoreson's fatigue based on normal cardiac and pulmonary tests; 2) the ALJ erred by finding Thoreson could sustain full-time work; 2) the Appeals Council erred by failing to remand based on new compassionate allowances.  (Mem. in Supp. of Pl's Mot. for Summ. J. at 10-16 ("Pl's Mem."))

### A. RFC and Credibility

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. §§ 404.1545(a); 416.945(a). In determining a claimant's RFC, the ALJ must consider all relevant evidence and evaluate the claimant's credibility. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). "The ALJ may reject [the conclusions of any medical expert, whether hired by the claimant or the government] if they are inconsistent with the record as a whole . . ." *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)).

An ALJ may not discount a claimant's subjective complaints based solely on lack of objective findings to explain the severity of the symptoms. *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005). An ALJ may discount subjective complaints, however, if they are "inconsistent with the evidence as a whole." (*Id.*) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004)) (internal quotation omitted)). In assessing credibility, the ALJ should consider factors including prior work record; observations by physicians and other third parties; the claimant's daily activities; the duration, frequency and intensity of the symptoms; the claimant's treatment, its effectiveness, and side effects; precipitating and aggravating factors; and functional restrictions. *Polaski v. Heckler*, 739 F.3d 1320, 1322 (8th Cir. 1984). Courts should not disturb the ALJ's credibility decision if the ALJ discredits the claimant's subjective complaints for "good cause." *Goff*, 421 F.3d at 792 (quoting *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001)).

Thoreson contends her allegations of fatigue are credible for the following reasons: 1) her part-time employer and administrators at her schools provided accommodations for her health problems; and her success was dependent on being accommodated; 2) fatigue is a symptom of heterotaxy; 3) fatigue is consistent with the use of beta blockers; 4) fatigue results

from her inability to get a good night's sleep; 5) her poor performance on an IQ test was caused by fatigue. (Pl's Mem. at 14-16.) The Commissioner asserts Thoreson's subjective complaints are not credible because she only worked sporadically prior to her alleged onset date; and her daily activities are inconsistent with disability. (Def's Mem. in Supp. of Mot. for Summ. J. ("Def's Mem.") at 9.) Furthermore, no physician opined that Thoreson's physical impairments resulted in disability. (*Id.* at 9-10.) The Commissioner contends the ALJ's RFC finding is supported by Thoreson's improvement with conservative treatment, and with her objective test results. (*Id.* at 9.)

As the ALJ noted, Thoreson's cardiologist did not believe her heart condition was the cause of her fatigue because her cardiac status was excellent. (*Id.* at 358.) Dr. Dummer suggested Thoreson's fatigue was psychological. (*Id.*) However, Dr. Burns, the psychological consultative examiner, did not believe Thoreson's mental impairments fully accounted for her fatigue. (*Id.* at 559.) Dr. Burns attributed Thoreson's low score on an IQ test to physical fatigue. Thoreson's fatigue on one day of testing, however, does not support her allegations of chronic disabling fatigue. Despite Thoreson's anxiety, depression and sleep difficulty, in March 2007, her mental status examination was normal, and her GAF score was 55. (*Id.* at 370-71.) Thoreson's insomnia improved after she began taking Ambien in 2007. (*Id.* at 356, 364, 367.)

The Court must also consider the evidence submitted to the Appeals Council after the administrative hearing. Nurse D'Angelo from Marshfield Clinic stated that premature atrial contractions and beta blockers may have caused Thoreson's fatigue. (*Id.* at 1226.) Nevertheless, none of Thoreson's cardiologists or other physicians, including Dr. Nymo who worked at the same clinic as Nurse D'Angelo, found that her fatigue might be caused by PACS or her beta blocker (atenolol). Furthermore, Thoreson's complaints of fatigue predated her use of atenolol

in 2009, and her diagnosis of premature atrial contractions in 2010. Dr. Sutton stated the findings of occasional premature atrial contractions and interventricular conduction delay were not serious abnormalities. (*Id.* at 1199.) He ordered blood tests to look for a cause of Thoreson's fatigue. (*Id.*)

D'Angelo also opined Thoreson's chronic cough and wheezing was most likely explained by plastic bronchitis, which would account for her fatigue, but it was difficult to diagnose. (*Id.* at 1226.) Indeed, Thoreson was never diagnosed with plastic bronchitis. Moreover, none of Thoreson's pulmonary tests indicated obstructed large airways, the condition caused by plastic bronchitis. (*Id.* at 317, 296-97, 790, 785, 1199 and note 24.) In 2006, Dr. Chetty attributed Thoreson's cough and wheezing to asthma. (*Id.* at 410.) Dr. Nymo stated Thoreson's cough could be attributed to asthma, postnasal drip, GERD or her congenital heart disease. (*Id.* at 432.) In November 2008, Dr. Kurachek noted Thoreson did not have chronic otitis or bronchitis. (*Id.* at 825.)

Finally, there is nothing in the treatment records supporting D'Angelo's statement that Thoreson had chronic infections every 2-4 weeks for the past two years [D'Angelo's letter was written on March 28, 2011], and sinusitis or bronchitis once or twice a month since having her tonsils removed on June 2, 2010. In July 2009, Thoreson told Dr. Mullen she was doing well overall since moving to New Hampshire, but she had recent sinus congestion. (*Id.* at 551.) In September 2009, Dr. Fishman evaluated Thoreson for chronic cough but objective tests were negative for respiratory obstruction or restrictive defect. (*Id.* at 790.) Dr. Fishman only speculated that Thoreson might have a component of sinusitis or bronchitis, based on her positive response to antibiotics in November 2008. (*Id.* at 816.) Dr. Mullen did not diagnose sinusitis or bronchitis in February 2010. (*Id.* at 785.) In January 2011, Dr. Sutton noted

Thoreson's history was "fairly unremarkable" since May 2010. (*Id.* at 1198.) Thoreson told Dr. Sutton that she had considerable fatigue in the morning but it improved throughout the day. (*Id.*) He ordered blood work to look for an explanation for Thoreson's fatigue but the lab results are not in the record. (*Id.* at 1199.) Because D'Angelo's explanations for Thoreson's fatigue are inconsistent with the record as a whole, D'Angelo's letter does not support reversal of the ALJ's decision.

The ALJ did not rely solely on the lack of objective findings for Thoreson's fatigue to discredit her subjective allegations. The ALJ believed Thoreson's ability to attend college full-time and graduate *summa cum laude*, and then attend graduate school and obtain As and Bs as a full-time student was inconsistent with her allegation of disability. Thoreson asserts she was only able to succeed with substantial accommodations. (Admin. R. at 73-74.) Thoreson told Dr. Burns she had to give up school because she could not remember things, but the ALJ noted Thoreson said she was going to take a year off to volunteer at Boston's Children Hospital before starting graduate school. (*Id.* at 555, 570.) The Court notes Thoreson finished undergraduate school in about four years, and was able to maintain full-time status and high grades as a graduate student after moving back to Wisconsin from New Hampshire. Presumably, Thoreson believed she would ultimately work in the field of psychology, because she was pursuing her master's degree. Attending college on a full-time basis is inconsistent with a claim of disability. *Wilson v. Astrue*, Civil No. 09-2064, 2010 WL 2268370, at *29 (W.D. Ark. June 3, 2010) (citing *Tenant v. Apfel*, 224 F.3d 869, 871 (8th Cir. 2000); *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Grace v. Sullivan*, 901 F.2d 660, 662 (8th Cir. 1990)); *see also Smith v. Astrue*, No. 4:09CV00383 JMM/BD, at *9 (E.D.Ark. Oct. 8, 2010) (affirming where ALJ considered college

attendance as one negative credibility factor, although claimant received support services and withdrew from some classes).

The wording of D'Angelo's disability opinion leaves open the possibility that Thoreson could perform some type of work. D'Angelo said, "[a]ll of these medical issues result in [Thoreson's] inability to hold a job that would provide a significant source of income." (*Id.* at 1228.) This could be interpreted to mean Thoreson could work only part-time, but D'Angelo might also have meant Thoreson could perform only a low paying job. Thoreson was actively and successfully pursuing a skilled profession. When asked to provide an opinion that Thoreson could not perform a sedentary light-duty type job on a full-time basis, Thoreson's treating physician, Dr. Nymo, did not feel that he could do so; and he recommended a work hardening evaluation. (*Id.* at 10.) Dr. Dummer's only work restriction was that Thoreson should be allowed to rest when exercise caused palpitations or fatigue. (*Id.* at 545.) *See Masterson v. Barnhart*, 363 F.3d 731, 739 (affirming ALJ in part because no treating or examining physician restricted claimant's daily activities). The ALJ limited Thoreson to sedentary, low to moderate stress work.

Thoreson has a very serious condition that requires regular monitoring. She is doing surprisingly well as a consequence of that monitoring. Although the record could support two conclusions, the ALJ's decision that minimal objective findings, conservative treatment, and Thoreson's academic success are indicative of her ability to perform less than sedentary, low to moderate stress, full-time employment is supported by the record as a whole.

### B. The Compassionate Allowances in the POMS

Thoreson alleges the Appeals Council should have found her disabled based on the compassionate allowances for single ventricle and hypoplastic left heart syndrome. (Pl's Mem.

at 15-16.)  On July 29, 2011, the SSA amended the POMS to create compassionate allowances for individuals with a single ventricle,[33] and hypoplastic left heart syndrome. [34]  The suggested evaluation is that a person with a single ventricle may meet Listings 4.02, 4.06 or 104.06; and person with hypoplastic left heart syndrome may meet Listings 4.06 or 104.06. *Id.*  The compassionate allowances specifically state, "[a]djudicators may, at their discretion, use the Medical Evidence of Record or the Listings suggested to evaluate the claim.  However, the decision to allow or deny the claim rests with the adjudicator."  Thus, the Appeals Council did not err in declining to find that Thoreson met a listed impairment and was not required to remand to the ALJ for consideration of the compassionate allowance.[35]    Furthermore, the Appeals Council's decision to deny review of the ALJ's decision is unreviewable by the court. *Mackey*, 47 F.3d at 953.

## IV.    RECOMMENDATION

Based on all the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED that:

1.    Plaintiff Thoreson's Motion for Summary Judgment [Doc. No. 7] be **DENIED**;

2.    Defendant Commissioner's Motion for Summary Judgment [Doc. No. 13] be **GRANTED**;

---

[33] POMS § DI 23022.590, available at https://secure.ssa.gov/poms.nsf/lnx/0423022590

[34] Hypoplastic left heart syndrome is a congenital heart defect where the left side of the heart is severely underdeveloped.  POMS § DI 23022.565, available at https://secure.ssa.gov/poms.nsf/lnx/0423022565

[35] Apart from the compassionate allowances, Thoreson does not contend that she has the required findings of chronic heart failure under Listing 4.02 or symptomatic congenital heart disease with cyanosis or secondary pulmonary cardiovascular obstructive disease under 4.06.  The Court notes this decision does not preclude Thoreson from submitting a new application to the SSA now that the compassionate allowances are in effect.

Dated:  January 29, 2013                    s/Steven E. Rau
                                            Steven E. Rau
                                            U.S. Magistrate Judge


Under D.Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 13, 2013**, a writing which specifically identifies those portions of the Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.